UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| DANIEL REED, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
|     v. | )   CIVIL NO.  1:15cv188 |
| | ) |
| ARDAGH GLASS, INC. d/b/a | ) |
| SAINT-GOBAIN CONTAINERS and | ) |
| UNITED STEEL, PAPER AND | ) |
| FORESTRY, RUBBER, | ) |
| MANUFACTURING, ENERGY, | ) |
| ALLIED INDUSTRIAL AND SERVICE | ) |
| WORKERS INTERNATIONAL UNION | ) |
| and its LOCAL 115T, | ) |
| | ) |
|     Defendants. | ) |

OPINION AND ORDER

This matter is before the court on a motion to take judicial notice filed by Defendants

United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service

Workers International Union ("International") and its Local 115T (collectively, "the Union"), on

September 16, 2016. The other parties have not responded or objected to the motion.

Also before the court is a motion for summary judgment filed by the Union on September

16, 2016. The plaintiff, Daniel Reed ("Reed"), filed his response on October 14, 2016, to which

the Union replied on October 31, 2016.

Additionally, on September 19, 2016, defendant Ardagh Glass, Inc. ("Ardagh" or "the

Company") filed a motion for summary judgment. Reed filed a response to the motion on

October 17, 2016 to which Ardagh replied on November 4, 2016.

For the following reasons, all three motions will be granted.

Discussion

The court will first discuss the motion to take judicial notice.   The Union requests the Court to take judicial notice of the following Indiana state court documents, which have been submitted as exhibits:

1.      February 11, 2010 restraining order against Reed  issued by the Jay County, Indiana, Circuit Court.

2.      February 23, 2010 permanent injunction against Reed issued by the Jay County, Indiana, Circuit Court.

3.      March 26, 2010 motion for order of contempt filed in the Jay County, Indiana, Circuit Court.

4.      March 26, 2010 Chronological Case Summary entry regarding contempt hearing date setting issued by the Jay County, Indiana, Circuit Court.

5.       April 30, 2010 Order on Sanctions of the Jay County, Indiana, Circuit Court on contempt motion.

6.       May 24, 2010 motion to correct errors filed by Reed on the contempt order filed in the Jay County, Indiana, Circuit Court.

7.      June 30, 2010 Order Denying Motion To Correct Errors by the Jay County, Indiana, Circuit Court.

8.      July 29, 2010 Notice of Appeal From Trial Court filed by Reed over the contempt order with the Jay County, Indiana, Circuit Court.

9.      August 29, 2011 Indiana Court of Appeals opinion affirming ruling of trial court denying motion to correct errors on contempt order.

As noted, there is no objection to the motion.  The court will grant the motion.

Next, the court will turn to the motions for summary judgment. Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Not every dispute between the

parties precludes summary judgment, however, since "[o]nly disputes over facts that might affect the outcome of the suit under the governing law" warrant a trial. Id. To determine whether a genuine issue of material fact exists, the court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. Heft v. Moore, 351 F.3d 278, 282 (7th Cir. 2003). A party opposing a properly supported summary judgment motion may not rely merely on allegations or denials in its own pleading, but rather must "marshal and present the court with the evidence she contends will prove her case." Goodman v. Nat'l Sec. Agency, Inc., 621 F.3d 651, 654 (7th Cir. 2010).

In his July 23, 2015 Complaint, Reed alleges that the Union breached the duty of fair representation they owed to Reed after his former employer and co-Defendant Ardagh Glass, terminated him on February 12, 2010.  Reed also alleges that Ardagh Glass breached the Collective Bargaining Agreement (" CBA").  The Union and Ardagh Glass have filed separate motions for summary judgment.

The following facts are relevant to both motions. Keith Olmstead is a Staff Representative for USW District 7.  Olmstead has held this position since October 29, 1995.  As a Staff Representative, Olmstead negotiates contracts on behalf of USW local unions and the International.  These contracts include grievance-arbitration procedures that allow actions by employers to be challenged as being inconsistent with the applicable contract. Olmstead meets with local union officials and companies to try to resolve grievances that have been filed once they have reached the applicable step of the contractual grievance-arbitration procedure. If Olmstead and the local union cannot resolve the grievances with the Company, Olmstead has the authority to advance grievances to arbitration.  Olmstead is responsible for presenting

arbitration cases on behalf of the International and the local unions he represents for grievances that have been advanced to arbitration. He has handled more than fifty arbitrations.

Since 2005, the USW and its Local 115T have been the exclusive collective bargaining representative for the Mold Makers and Mold-Making Apprentices who work at the Company's Dunkirk, Indiana facility. A separate Dunkirk facility bargaining unit is represented by Local 124 of the Glass, Molders, Pottery, Plastics and Allied Workers Union ("GMP"). The Union and the Company were parties to a CBA effective between September 1, 2008 and August 31, 2013. GMP and Local 124 negotiated separate collective bargaining agreements with the Company. The CBA between the Union and the Company included a five-step grievance-arbitration procedure in Article 25 that could culminate in "final and binding" arbitration. Under this procedure, the arbitrator could not add to, subtract from or modify any provisions of the CBA.

Reed was a bargaining unit employee who was employed by the Company from July 6, 1998 until his termination on February 12, 2010. Between 2004 and 2010, he was the President of USW Local 115T. Reed went on sickness and accident disability leave from the Company on January 7, 2010. On January 25, 2010, while he was still on sickness and accident disability leave, Reed was on Company property. The Company contended that Reed did not have permission to be on its property at that time. Reed alleges in his response to the motion for summary judgment that he went to the plant to obtain a write-up because he was investigating the Company's time clock policy which he believed had led to inconsistent discipline among the union members he served. (Reed Decl ¶¶ 4, 5).

On the evening of January 26, 2010, while still on sickness and accident disability leave, Reed went on the Company property again. The Company again contended that Reed did

not have permission to be on its property. On that day, a confrontation occurred between Reed and Company Supervisor Tim Coleman and Reed was asked to leave the Company property. During this confrontation, Reed testified that Coleman twice told Reed that Coleman had orders to "throw [Reed] out." (Reed Dep. p. 86; Reed Dep. Ex. 11). In response, Reed testified that he told Coleman that he had three choices: 1) Coleman could get the Company's supervisor and plant manager Kim Pratt on the phone; 2) Coleman could call the police; or 3) Coleman could throw Reed out. (Reed Dep. p. 86). Reed made similar admissions about his January 26, 2010 confrontation with Coleman in his written statements outlining his version of the events of that day. (Reed Dep. Ex. 11; Reed Dep. Ex. 22). Reed again claims that he was on Company property to conduct union business.

On February 1, 2010, the Company sent Reed a letter informing him that he was suspended pending termination for his actions during the January 26, 2010 incident.(Olmstead Decl. ¶ 8, Ex. 2). The suspension letter stated, in relevant part:

> This decision has been made due to the behavior you displayed on January 26, 2010 whereby you were blatantly insubordinate towards management, and inevitably created a hostile work environment for both management and non-management personnel.

(*Id.*).

On February 12, 2010, the Company converted Reed's disciplinary suspension to a termination. (Olmstead Decl. ¶ 10, Ex. 3). The termination letter stated, in relevant part:

> This action was taken in part because, on January 25 and 26, 2010, you threatened SGCI supervisors; trespassed on company property when you had no right to be in the plant; and, after having been specifically told not to be on plant property, engaged in blatant insubordination and hostile and belligerent behavior towards SGCI supervisors.

(*Id.*).

On February 15, 2010, the Union filed a grievance on Reed's behalf to challenge his

termination. The grievance alleged that the Company's discharge of Reed violated the CBA and it sought Reed's reinstatement with make whole relief.

On February 19, 2010, the Company denied Reed's termination grievance at the 3rd step of the grievance-arbitration procedure. On February 23, 2010, the Union referred Reed's termination grievance to the 4th step of the CBA's grievance-arbitration procedure.

On March 11, 2010, a 4th step grievance meeting was held. On March 22, 2010, the Company denied Reed's termination grievance at the 4th step of the grievance-arbitration procedure. The Union decided to wait to submit Reed's termination grievance to arbitration until the Company's restraining order action against Reed (discussed below) was resolved. The grievance was put on hold through an informal agreement between the Company and the Union.

On February 11, 2010, the Company filed for and was granted a restraining order against Reed by the Jay County, Indiana Circuit Court ("Jay County Court"). On February 23, 2010, the Jay County Court entered a permanent injunction barring Reed from the Company property. On March 26, 2010, the Company filed a motion for contempt and request for a hearing with the Jay County Court alleging that Reed violated the restraining order against him over an incident that occurred at the Moose Lodge in Dunkirk, Indiana on March 24/25, 2010. On March 26, 2010, the Court issued a contempt citation against Reed and set a hearing date to address the Company's motion for contempt. On April 30, 2010, a hearing was held by the Jay County Court on Reed's contempt charge. Reed was sentenced to 180 days in jail, with 113 days suspended on the condition he did not violate the injunction for one year. He was also ordered to pay $2,500 in attorney's fees.

On May 24, 2010, Reed filed a motion to correct errors with the Jay County Court.

On June 30, 2010, a hearing was held by the Jay County Court on the motion to correct errors. The motion was denied.  On July 29, 2010, Reed's attorney, Ralph E. Dowling, filed a Notice of Appeal of the contempt finding with the Jay County Court.  On August 29, 2011, the Indiana Court of Appeals issued its opinion denying Reed's appeal.

On April 23, 2012, Reed filed a National Labor Relations Board ("NLRB") charge against the Union over its representation of him in connection with his termination grievance. According to Reed, the NLRB informed him that he could file a suit against the Union if the Union did not properly represent him in connection with the termination grievance. (Reed Dep. pp. 130-131). Reed testified that, by July 30, 2012, he knew he had a right to bring his fair representation claim in a lawsuit against the Union. (*Id.* at p. 131).

On June 1, 2012, Olmstead, who began servicing Local 115T in the Spring of 2012, sent Reed a letter informing him that his termination grievance was still open and that the Union was reviewing the merits of his grievance.  On June 22, 2012, Reed withdrew his NLRB charge against the Union.

In October, 2012, the Union advanced Reed's termination grievance to arbitration. While Reed's termination grievance was pending in the grievance procedure prior to arbitration, Olmstead engaged in settlement discussions over the grievance with the Company. Throughout the processing of the grievance, Reed's position regarding settlement was that he wanted reinstatement, full back pay and a written apology from the Company in order for the grievance to be settled. No settlement was achieved.

Olmstead communicated with Reed, mostly by e-mail, to prepare for the arbitration of Reed's termination grievance. Over a year before the arbitration took place, Reed provided

Olmstead with a large number of documents that Reed thought were relevant to his case. Reed transmitted "hundreds" of documents to Olmstead. (Reed Dep. p. 159). Reed admits that he provided Olmstead every single document that he believed was relevant to his grievance prior to the arbitration. (*Id*.). In advance of the arbitration, Reed also provided Olmstead with a list of witnesses that he thought could help the case at arbitration. (Olmstead Decl. ¶ 23; Olmstead Dep. p. 23; Reed Dep. 157; Reed Dep. Ex. 10).

Olmstead reviewed the information on potential witnesses that Reed had presented to him. Some of the potential witnesses Reed identified did not appear to have relevant information. Others had information that either might have harmed Reed's case or had already given an admissible statement.

Olmstead ultimately contacted or attempted to contact the following potential witnesses:

a. Jim Millikan – Vice President of Local 115T

b. Eric Hatzel – Member of Local 115T

c. Jerry Stewart – Member of Local 115T

d. Kevin Lowe – Hot End GMP Representative and President of GMP Local 124

e. Lindsey St. John – Reed's former girlfriend

f. Greg Miller – Friend of Reed who let Reed park his RV on his land

g. Mary Eley – Moose Lodge bartender

h. Ben Green – Present at Moose Lodge

i. Phil Million – Present at Moose Lodge

j. Mike Kiley – Present at Moose Lodge

Olmstead reviewed documents Reed had provided him, not all of which were helpful.

He also reviewed documents from the Union's grievance file and from the Company's civil suit against Reed to prepare for Reed's arbitration hearing and to determine what exhibits to introduce at the hearing.

The night before the July 25, 2013 arbitration hearing, Reed came to the Hampton Inn in Muncie, Indiana, where the hearing was scheduled to take place the next morning. Olmstead discussed with Reed the questions Olmstead would be asking him at the hearing and Olmstead agreed to modify some of the questions Olmstead had originally planned to ask Reed at Reed's request.

Reed also brought a large amount of documents with him that he wanted Olmstead to review. Reed testified that he already provided most of these documents to Olmstead before the Hampton Inn meeting. (Reed Dep. pp. 181-182). In fact, the only new document that Reed recalled providing to Olmstead during the meeting was a document that related to the Jay County Court injunction proceedings. (*Id.*). After Reed provided these documents, Olmstead explained to Reed that, since he had not produced the documents prior to that evening, it was too late in the process for Olmstead to review the documents and still have time to prepare for the hearing in the morning. By that time, it had been approximately a year since Olmstead had asked Reed to provide him all the documents Reed thought were relevant to the arbitration.( Reed Dep. pp. 157-158, 182).

An arbitration hearing over Reed's termination grievance was held before Arbitrator David Vaughn on July 25, 2013. Olmstead presented the case on behalf of the Union. Months before the arbitration, Olmstead had informed Reed, in response to his inquiry, that it was the USW's practice that International Staff Representatives presented arbitration cases instead of

attorneys. (Olmstead Dep. p.33; Reed Dep. pp. 186-188). Reed admits that he w no later than December 7, 2012 that Olmstead would be presenting the grievance at the arbitration. (Reed Dep. pp. 186-188). Reed also acknowledges that he is not aware of any arbitration case in which the Union hired or utilized an attorney to handle an arbitration hearing.(*Id*. at p. 188).

At the arbitration hearing, Olmstead decided to defer providing an opening statement to the Arbitrator until after the Company rested its case-in-chief. (Olmstead Decl. ¶ 30). This is a common strategy that is frequently employed in arbitration and Olmstead has employed it numerous times over the years. (*Id.*). Since the Company carried the burden of establishing that it had just cause to terminate Reed under the CBA, the Company had to present its case first. (*Id.*). By deferring his opening statement until the close of the Company's case, Olmstead was able to see all the evidence that the Company provided to the Arbitrator in support of its case. (*Id.*). This was advantageous to Olmstead because it provided him with the flexibility to decide which evidence and which arguments to advance on Reed's behalf during the Union's case-in-chief after the Company had finished presenting its evidence. (*Id.*; Reed Dep. pp. 225-226). During his deposition, Reed conceded that Olmstead's decision to defer his opening statement made sense (*Id*. at p. 226).

The Company called four witnesses to testify at the arbitration. (Olmstead Decl. ¶ 31).Olmstead cross-examined each of these witnesses. (Id.; Reed Dep. p. 188-189). The Union called nine witnesses at the arbitration hearing. (Olmstead Decl. ¶ 32). The Union introduced nine exhibits at the hearing. (*Id.*; Reed Dep. Ex. 1A-1X). There were also nine joint exhibits introduced at the hearing. (*Id.*).

At the close of the arbitration, the parties agreed to submit post-hearing briefs to the

Arbitrator. (Olmstead Decl. ¶ 33). Olmstead did not allow Reed to participate in the drafting of the Union's post-hearing brief because, to the best of Olmstead's knowledge, Reed did not have experience or training in writing a post-hearing brief. (*Id.*; Reed Dep. p. 123). Reed testified that he has never written or provided input into a post-hearing brief. (Reed Dep. p. 156). Reed admits that he knew no later than August 12, 2013 that Olmstead was not going to let him participate in the drafting of the Union's post-hearing brief. (*Id.* at pp. 226-227).

The Union submitted a twenty-seven page post-hearing brief. (Olmstead Decl. ¶ 33, Ex. 13; Reed Dep. p. 119-120). The brief advanced numerous arguments in support of the grievance and the Union's position that the Company did not have sufficient cause under the CBA to terminate Reed. (Olmstead Decl. ¶ 33, Ex. 13). Reed testified, "Of the evidence [Olmstead] presented, you can conclude that it was a very good brief." (Reed Dep. p. 125).

On October 8, 2013, Arbitrator Vaughn issued his Arbitration Opinion and Award which confirmed the Company's denial of Reed's termination grievance. (Olmstead Decl. ¶ 34, Ex. 14). Arbitrator Vaughn found that the Company had just cause under the CBA to terminate Reed, refused to reinstate Reed and denied the Union the relief it was seeking on Reed's behalf. (*Id.*). His decision was based on his analysis and evaluation of the evidence presented regarding Reed's conduct on January 26, 2010. (*Id.* at p. 41-46). Arbitrator Vaughn concluded, "I am convinced that the evidentiary record demonstrates that, on January 26, [Reed] trespassed, threatened two supervisors and was insubordinate." (*Id.* at p. 41).

On October 15, 2013, Olmstead e-mailed Reed to inform him of the result. (Olmstead Decl. ¶ 35, Ex. 15, 16; Reed Dep. p. 225). In his e-mail to Reed, Olmstead wrote:

> Dan, I have received the opinion and award from Arbitrator Vaughn in your termination hearing. The arbitrator upheld your discharge. I am sorry the results

of the hearing did not result in your being returned to work. I felt that we put on
the best case we could given the facts we had to work with. If I can be of help or
assistance in the future please contact me.

(Olmstead Decl. ¶ 35, Ex. 15). Reed received Olmstead's e-mail on October 15, 2013. (Reed

Dep. p. 125).

Additionally, in October, 2013, Olmstead had a conversation with Reed in which

Olmstead informed him that the Arbitrator had denied his grievance. (Olmstead Decl. ¶ 35).

Reed asked Olmstead what the next step was. (*Id*.). Olmstead explained to him that, based on the

language of the CBA, arbitration decisions were final and binding on both the Company and the

Union. (*Id*.). Olmstead also informed Reed that, although the Arbitrator's decision could

technically be appealed, based upon Olmstead's reading of the award and how it was structured,

Olmstead's opinion was that it would be futile to file an appeal. (*Id*.; Olmstead Dep. pp. 45-46).

Reed admitted during his deposition that Olmstead told him that the Arbitrator's decision

was not going to be appealed. (Reed Dep. p. 227). According to Reed, Olmstead told him before,

during and after the arbitration that the Arbitrator's decision was "final and binding" and that the

Arbitrator's decision would not be appealed. (*Id*. at pp. 227-228). Reed also testified that the

CBA made these points clear. (*Id.* at p. 227).

On October 17, 2013, shortly after Olmstead notified Reed about the arbitration decision,

Reed sought Olmstead's assistance with a pension issue. (Olmstead Decl. ¶ 36, Ex. 17, 18).

Olmstead raised this issue with the Company and forwarded the Company's response to Reed.

(*Id.*). On December 13, 2013, Reed filed a second NLRB charge against the Union in connection

with the Union's handling and processing of the termination grievance. (Olmstead Decl. ¶ 37,

Ex. 19; Reed Dep. p. 132). Reed acknowledges that, in his December 13, 2013 unfair labor

practice charge against the Union, he made the same claim that he is making against the Union in this lawsuit, namely that it breached its duty of fair representation in connection with the processing of his termination grievance and the handling of the arbitration. (Reed Dep. p. 134). In his December 13, 2013 NLRB charge against the Union, Reed alleged: "On or about July 24, 2013, [the Union] breached its duty of fair representation by failing to adequately represent Daniel J. Reed at an arbitration hearing." (Olmstead Decl. ¶ 37, Ex. 19). After Reed filed this December 13, 2013 NLRB charge, Olmstead did not have any further communications with him. (Olmstead Decl. ¶ 37).

Reed admits that he knew the Union was not going to take any additional action with respect to his termination grievance by the time he filed his December 13, 2013 NLRB charge against the Union. (Reed Dep. pp. 229-230). In fact, he contends that he filed his unfair labor practice charge at that time for that very reason. (*Id.*).

On January 31, 2014, Reed's NLRB charge was dismissed. (Olmstead Decl. ¶ 38, Ex. 20). He appealed the dismissal and the NLRB's General Counsel's office issued him a written notice on April 29, 2014 that it was denying his appeal. (Olmstead Decl. ¶ 38; Ex. 21; Reed Dep. p. 137). About April 29, 2014, Reed received that written notice, which advised him that his appeal had been denied. (Reed Dep. p. 137).

Between April 29, 2014 and the filing of his Complaint in this matter on July 23, 2015, Reed did not have any communications with any Union representative about the allegations in his Complaint. (Reed Dep. p. 230).

On July 23, 2015, Reed filed his Complaint in this matter against the USW, Local 115T and the Company. Reed alleged that the USW and Local 115T breached the duty of fair

representation owed to him by failing to retain an attorney to present Reed's case, refusing to allow Reed meaningful input into the preparation and presentation of his case, refusing to call critical witnesses necessary to rebut the Company's testimony at arbitration, and failing to conduct a reasonable investigation into Reed's allegations. Reed also alleged that the USW and Local 115T acted in bad faith by refraining from vigorously presenting Reed's case to the Arbitrator and refusing to allow Reed input into the post-hearing brief. Reed also contended that the Company breached the CBA by terminating him.

Both the Union and Ardagh Glass contend that Reed's claims are barred by the statute of limitations. It is well established that a claim alleging a breach of a union's duty of fair representation is subject to a six month statute of limitations. *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 154-55 (1983); *Johnson v. Graphic Communications Int'l Union*, 930 F.2d 1178, 1182 (7th Cir. 1991), cert. denied, 502 U.S. 862 (1991). This firm, six month time-frame starts to run once the union makes a final decision on a plaintiff's grievance, or in the alternative, once a plaintiff discovers, or with reasonable diligence should have discovered, that the union would take no further action in support of the plaintiff's claim. *Chapple v. National Starch & Chem. Co.*, 178 F.3d 501, 505 (7th Cir. 1999); *Christiansen v. APV Crepaco*, Inc., 178 F.3d 910, 912, 914-15 (7th Cir. 1999).

The defendants claim that there is no genuine issue of material fact that precludes this Court from concluding that Reed's Complaint is time-barred because it was not filed within six months of the accrual of his representation claims. The defendants point out that Reed's fair representation allegations all relate to Union Defendants' handling and processing of the termination grievance. The defendants argue that Reed knew, or should have known, more than

six months before he filed his July 23, 2015 Complaint that Union Defendants were not going to take any further action in connection with his termination grievance. In fact, by Reed's own admission, he knew no later than late 2013 that Union Defendants were not going to take any additional action with respect to his termination grievance.

To reiterate, the relevant undisputed facts relating to the timeliness of Reed's fair representation claims are as follows. On October 8, 2013, Arbitrator Vaughn issued his Opinion and Award in which he denied the termination grievance and refused to reinstate Reed. (Olmstead Decl. ¶ 34, Ex. 14). On October 15, 2013, Olmstead notified Reed of the Arbitrator's decision and advised Reed that he was not being returned to work. (Olmstead Decl. ¶ 35, Ex. 15). Reed concedes that he knew after receiving Olmstead's October 15, 2013 email that the Union was not going to proceed further with his termination grievance. (Reed Dep. pp. 227-230). In fact, Reed acknowledges that the Union made it clear before, during and after the arbitration that arbitration decisions like the one issued in his case are "final and binding." (Reed Dep. pp. 227-228). Reed also knew this because the same information was stated in the CBA. (*Id*.).

On December 13, 2013, Reed filed his second NLRB charge against the Union. (Olmstead Decl. ¶ 37, Ex. 19; Reed Dep. p. 132-134). Like his Complaint in this action, the December 13, 2013 NLRB charge alleges that Union Defendants breached their duty of fair representation in connection with the arbitration of his termination grievance. (*Id*.). Reed concedes that he filed the December 13, 2013 NLRB charge against Union Defendants because he knew they were not going to take any additional action with respect to his termination grievance. (Reed Dep. pp. 229- 230).

It is therefore undisputed that, no later than December 13, 2013, Reed knew that Union

Defendants were not going to take any additional action with respect to his termination grievance. Thus, at the latest, Reed's fair representation allegations against Union Defendants all accrued before he filed his December 13, 2013 NLRB charge alleging that Union Defendants breached the duty of fair representation. *See, e.g., Christiansen*, 178 F.3d at 912, 914-915. An accrual date of December 13, 2013 clearly establishes that Reed's July 23, 2015 Complaint is time-barred because his fair representation suit was not filed until over nineteen months later. *See, e.g.,Johnson*, 930 F.2d at 1178.

Reed argues that the statute of limitations should be equitably tolled due to Union misrepresentation. Equitable estoppel comes into play if the defendant takes active steps to prevent the plaintiff from suing in time. *Cada v. Baxter Healthcare Corp.*, 920 F.2d 466 (1990), quoting *Holmberg v. Armbrecht*, 327 U.S. 392, 396-397. Equitable estoppel in the limitations setting is sometimes called fraudulent concealment. *Id*. Equitable tolling permits the plaintiff to avoid the bar of the statute of limitations if, despite all due diligence, he is unable to obtain vital information bearing on the existence of his claim. *Id*. at 451. In the present case, Reed claims that Olmstead told him that the arbitration was final and binding. Reed argues that he should have been informed that there was a procedure by which he could appeal the arbitration. Reed claims that because he lacked the resources to file a lawsuit, he filed an unfair labor practice charge with the NLRB. Reed claims that the Board agent that handled his charge told him that he had two years to file a lawsuit against the Union in federal court.

Reed inadequately attempts to lay blame on the Union for his failure to file his duty of fair representation case within the applicable six month statute of limitations. Reed claims that the Union failed to inform him that the arbitrator's award could have been appealed. However,

whether or not the decision of the arbitrator could have been appealed is irrelevant to Reed's decision – apparently financially based – to wait almost two years to file a fair representation suit against the Union for allegedly failing to properly litigate his arbitration case. Moreover, the decision as to whether or not to file suit to set aside the arbitrator's award under the limited grounds available under state or federal law was for the Union to make. *Freeman v. Local Union No. 135 Chauffeurs, Teamsters, etc.*, 746 F.2d 1316, 1321-1322 (7th Cir. 1984) (Union does not breach its duty of fair representation by refusing to appeal an arbitrator's award). Even assuming the Union's representations about the finality of the arbitration award were inaccurate, there is no claim by Reed that he relied on those representations in delaying filing suit against the Union for breach of its duty of fair representation. Therefore, there is no evidence of fraudulent concealment by the Union that would support an argument for equitable estoppel of the statute of limitations. *Chapple v. National Starch & Chem. Co.*, 178 F.3d 501, 506-507 (7th Cir. 1999).

Reed obviously knew that he could bring a fair representation claim to raise his complaints concerning the Union's handling of his arbitration case because he filed an NLRB charge over the same issue within six months of the arbitration hearing and award. All of Reed's complaints about the Union's handling of his arbitration case accrued before the issuance of the arbitrator's award. Thus, there is no evidence that Reed was unable to determine when the Union was supposedly mishandling his termination grievance. Additionally, that a representative of the NLRB may have incorrectly told Reed that he had two years to file a fair representation suit against the Union is not grounds for tolling the six month statute of limitations. Since a reasonable person in Reed's position would have been aware within the limitations period of the facts giving rise to this suit, Reed has not offered a basis for equitable tolling of the six month

statute of limitations. *Chapple v. National Starch & Chem. Co.*, 178 F.3d at 505-506.

In any event, even if Reed's Complaint is not time-barred, it nevertheless fails on the merits. To prevail on a claim against a union for breach of the duty of fair representation, a plaintiff must establish both: 1) that the employer violated the collective bargaining agreement and 2) that the union breached its duty of fair representation. *Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 564 (1990). A plaintiff's underlying claim that the employer violated the collective bargaining agreement therefore must have merit as a matter of law. *Neal v. Newspaper Holdings, Inc.*, 349 F.3d 363, 368 (7th Cir. 2003). The Seventh Circuit has articulated that: "when an employee's underlying contract claim lacks merit as a matter of law, the employee cannot complain that the union breached its duty of fair representation in failing to process the grievance" because the "employee suffers no injury when the union fails to go forward with a meritless claim." *Souter v. Int'l Union, UAW, Local 72*, 993 F.2d 595, 598 (7th Cir. 1993); *see also Garcia v. Zenith Elecs. Corp.*, 58 F.3d 1171, 1176 (7th Cir. 1995) (plaintiff must establish that he "was actually harmed by the union's actions."). In the present case, as discussed more fully below, it is clear that the Union is not liable to Reed for breach of the duty of fair representation as a matter of law because the Company, Ardagh Glass, did not violate the CBA. Likewise, without a showing of a violation of the CBA, Reed's claim against Ardagh Glass fail.

An arbitrator's findings of fact and interpretation of a labor agreement are final and conclusive even if the decision rests on factual error or misinterprets the parties' agreement. *Major League Baseball Ass'n v. Garvey*, 532 U.S. 504, 121 S. Ct. 509 (2001). The Supreme Court has explained that where, as here, the parties agreed to hire an arbitrator as their contract

18

interpreter, the arbitrator's "improvident, even silly, fact finding" does not provide a basis for a reviewing court to refuse to enforce the award. *Eastern Associated Coal v. United Mineworkers*, 531 U.S. 57, 62-63, (2000) (quoting, *Paperworkers v. Misco, Inc.*, 484 U.S. 29, 39 (1987)). In the case at bar, Arbitrator Vaughn relied on the authority conferred to him by the Company and the Union through the CBA to determine that the Company did not violate the CBA in terminating Reed. Under Article 25 of the CBA, the Arbitrator's decision was "final and binding." (Olmstead Decl.). Arbitrator Vaughn therefore conclusively determined that the Company had good cause to terminate Reed for his conduct on January 26, 2010. In light of the authority conferred to Arbitrator Vaughn and the decision he reached, Reed does not have a breach of duty of fair representation claim against the Union because he has no valid claim that the Company violated the CBA in terminating him.

Moreover, Reed has not produced and cannot produce any evidence to establish that Arbitrator Vaughn's decision is inconsistent with the CBA or improper in any way. Arbitrator Vaughn even credited the Union's argument that the Company's attempt to discipline Reed for any of his conduct on January 25, 2010 was improper. (Olmstead Decl. ¶ 34, Ex. 14, p. 41). Yet, he nevertheless concluded that the Company had a right under the CBA to direct its workforce and that Reed was insubordinate on January 26, 2010 because Reed refused to comply with management's direction for him to leave its premises. (*Id*. at p. 42). Although Arbitrator Vaughn concluded that Reed was not conducting Union business on January 26, 2010 when he was told to leave the Company's property, Arbitrator Vaughn found that, even if he had concluded that Reed was conducting union business at that time, his "threats" against management and refusal to comply with "a proper directive to leave the plant" could not be excused. (*Id*. at p. 43). These

findings underscore precisely why Reed cannot make the necessary showing in this case that the Company violated the CBA in terminating Reed.[1]  Therefore, summary judgment in favor of Ardagh Glass is appropriate.

With respect to the Union, a breach of the statutory duty of fair representation occurs "only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Vaca*, 386 U.S. at 190. A "union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness' as to be irrational." *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 67 (1991). "Any substantive examination of a union's performance ... must be highly deferential, recognizing the wide latitude that negotiators need for the effective performance of their bargaining responsibilities." *Id.* at 78 (citing, *Ford Motor Co. v. Huffman*, 345 U.S. 330, 338 (1953)). Even mere negligence on the part of a union is insufficient to state a claim for breach of the duty of fair representation. *Neal*, 349 F.3d at 369 (citing, *United Steelworkers of Am. v. Rawson*, 495 U.S. 362, 372-73 (1990)); *see also Castelli v. Douglas Aircraft Co.*, 752 F.2d 1480, 1482 (9th Cir. 1985)("the grievance process need not be error free—to constitute a breach of the duty of fair representation, more than a mere error of judgment must occur."). "As a result, courts will interfere with union decisions about employee grievance proceedings only if a union shows reckless disregard for the rights of an employee." *Castelli,* 752 F.2d at 1482.

In determining whether or not a union's actions are discriminatory or in bad faith, an

---

[1]  Additionally, as Ardagh Glass notes, there are significant *res judicata* issues, due to the judgments against Reed in Jay County, relating to his actions on Company property.

inquiry into the subjective motivation of the union officials must be conducted. *Crider v. Spectrulite Consortium*, 130 F.3d 1238, 1243 (7th Cir. 1997) (citing, *Trnka v. Local Union No. 688, UAW, 30* F.3d 60, 63 (7th Cir. 1994)). The inquiry "requires proof that the union acted (or failed to act) due to an improper motive." *Neal*, 349 F.3d at 369 (emphasis added). To meet the burden of proving discriminatory or bad faith conduct, Reed must establish both the Union's subjective hostility toward him individually and evidence that the hostility negatively impacted the Union's representation. *Souter*, 993 F.2d at 598-599. As the Seventh Circuit stated in *Yeftich v. Navistar, Inc.*, 722 F.3d 911, 916 (7th Cir. 2013), "[b]are assertions of the state of mind required for the claim ... must be supported with subsidiary facts." (holding that plaintiffs did not state sufficient evidence to show union acted in bad faith and citing, *Ashcroft v. Iqbal*, 556 U.S. 662, 680-83 (2009)). Clearly, in the present case, the Union Defendants did not breach the duty of fair representation owed to Reed. Rather, the Union Defendants' handling of Reed's termination grievance was well within the "wide range of reasonableness" afforded to unions in carrying out their representational duties. *See O'Neill*, 499 U.S. at 67.

There are simply no facts to support a charge that Union Defendants acted in an unreasonable manner in processing Reed's termination grievance. For example, the undisputed record evidence establishes that the Union filed a grievance over Reed's termination and processed it through the steps of the grievance-arbitration procedure. While the grievance was pending, it tried to reach a settlement that was acceptable to Reed. After determining that settlement of the grievance was not possible, the Union advanced the grievance to arbitration. The Union prepared for the arbitration by interviewing numerous potential witnesses and reviewing a very large number of documents, including literally hundreds of documents obtained

from Reed. The Union communicated with Reed to prepare for the arbitration and Olmstead went over testimony to be presented at the hearing with Reed.

At the hearing, the Union introduced joint exhibits and its own exhibits, called several witnesses and cross-examined the Company witnesses. After the hearing, it submitted a twenty-seven page brief that included numerous legal arguments and citations to support its contention that the Company violated the CBA in terminating Reed. Once the Arbitrator issued his decision denying the grievance, the Union immediately notified Reed. Upon receipt of this notification, Reed understood that the Union was not taking any additional action with respect to his termination grievance. These actions all support a finding that Union Defendants met and went well beyond the minimum threshold that their actions not be "irrational," *see O'Neill*, 499 U.S. at 67, or reflect "an egregious disregard for union members' rights." *See Truhlar v. United States Postal Serv.*, 600 F.3d 888, 893 (7th Cir. 2010), cert. denied, 562 U.S. 982 (2010) (quoting, *Garcia*, 58 F.3d at 1176).

Reed contends that Union Defendants breached the duty of fair representation by their preparation for and handling of the arbitration. Yet, the decisions as to what witnesses to call, what questions to ask witnesses and what documents to introduce at an arbitration hearing are judgment calls for the Union to make. In carrying out its duty to fairly and properly represent Reed, the Union was certainly not obligated to let Reed make the ultimate determination as to who the witnesses should be, what questions they should be asked or what exhibits should be introduced. Likewise, there is neither an obligation on the part of the Union to have an attorney present the case to the arbitrator, nor a duty on the part of the Union to let a grievant have editorial control over a post-hearing brief. *Garcia*, 58 F.3d at 1179 (failure by union to adopt

grievant's preferred arbitration approach and strategy does not prove disregard for grievant's case sufficient to breach standard of representation imposed on union).

The significant input that Union Defendants allowed Reed with respect to the presentation of the termination grievance to the Arbitrator further demolishes any argument that the Union breached its duty of fair representation. It is abundantly clear that the Union Defendants' actions in connection with Reed's termination were within the "wide range of reasonableness" afforded to unions in carrying out their representational duties. Given the deference afforded to unions to make these types of decisions, this Court cannot "substitut[e] [its] judgment for that of the union." *Neal*, 349 F.3d at 369 (quoting, *Ooley v. Schwitzer Div. Household Mfg., Inc.*, 961 F.2d 1293, 1302 (7th Cir. 1992), cert. denied, 506 U.S. 872 (1992)).

There is an Indiana statute under which an arbitration award can be challenged for certain narrow grounds within ninety days after the mailing of the award. Ind. Code § 34-57-2-13. Cases seeking vacation of an arbitration award are often removed to federal court. The Supreme Court and the Seventh Circuit have held that judicial review of labor-arbitration awards is "extremely narrow." *Arch of Illinois v. District 12, United Mine Workers of America*, 85 F.3d 1289 (7th Cir. 1996); *see also Garvey*, 121 S. Ct. at 1729 ("Judicial review of a labor-arbitration decision pursuant to such an agreement is very limited"). As the Supreme Court stated in *Garvey*, a court may not vacate an arbitrator's decision "if [he] is even arguably construing or applying the contract and acting within the scope of his authority." 532 U.S. at 509. Accordingly, the Seventh Circuit held that, "it is only when the arbitrator must have based his award on some body of thought, or feeling, or policy, or law that is outside the contract… that an award can be said not to draw its essence from the collective bargaining agreement." *Arch of*

*Illinois*, 85 F.3d at 1292. So long as a colorable argument could be made at the time of the union's decision to drop its support that the grievance is meritless, the decision cannot be regarded as arbitrary. *Trnka*, 30 F.3d at 61. Thus, the Union's decision, communicated to Reed, not to appeal the adverse arbitration decision on Reed's termination grievance was certainly not arbitrary or capricious. *See Freeman v. Local Union No. 135 Chauffers, Teamster, etc.*, 746 F.2d 1316, 1322 (7th Cir. 1984) (Union does not breach its duty of fair representation by refusing to appeal an arbitrator's award.).

Reed also has not presented any evidence to support a claim that the Union Defendants' actions were discriminatory or in bad faith. Reed presents no "evidence that his grievances were treated any differently from any other employee's similar grievances." *Filippo v. Northern Ind. Pub. Serv. Corp.*, 141 F.3d 744, 749 (7th Cir. 1998). *See Yeftich*, 722 F.3d at 916 (affirming dismissal of complaint where plaintiffs failed to state sufficient evidence to support their claim that union acted in bad faith); *Konen v. Int'l Bhd. of Teamsters, Local 200*, 255 F.3d 402, 407-08 (7th Cir. 2001) (finding that a union's decision not to arbitrate a grievance was not arbitrary or in bad faith when the grievant offered the union "no suggestions on how he could defend his conduct" and "offered no defense for his conduct."). There is no evidence that the Union exhibited any hostility or animus toward Reed, let alone evidence that its actions in processing the termination grievance were driven by animus against Reed. Reed also has not produced any evidence that the Union treated his termination grievance differently than it treated the grievance(s) of any similarly situated employee(s). Accordingly, Reed's duty of fair representation claim against the Union fails as a matter of law, and summary judgment will be granted in favor of the Union.

<u>Conclusion</u>

On the basis of the foregoing, the Union Defendants' motion to take judicial notice [DE32] and motion for summary judgment [DE 33] are both hereby GRANTED.

Further, Ardagh Glass' motion for summary judgment [DE 36] is also hereby GRANTED.

Entered: December 29, 2016.

<u>s/ William C. Lee</u>
William C. Lee, Judge
United States District Court
